**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**v.** **Case No.: 8:12-CR-472-T-17EAJ**

**JERMELL C. HICKMAN**
______________________________________/

**REPORT AND RECOMMENDATION**

Before the Court is Defendant's **Motion to Suppress Evidence and Request for Evidentiary Hearing** (Dkt. 20) and the United States' **Response in Opposition** (Dkt. 23).[1] Following an evidentiary hearing, the undersigned recommends that the motion to suppress be denied.

**Background**

On November 6, 2012, Defendant was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Defendant seeks to suppress the firearm and several statements made about the firearm by Defendant to law enforcement.

**Findings of Fact**

The following facts are established by a preponderance of credible evidence:

1. On October 10, 2012, special agents from the Internal Revenue Service ("IRS"), and other federal agents, assisted by local law enforcement, secured a residence at 2111 South 49th Street (the "residence") and executed a federal search warrant seeking evidence that Defendant Jermell Hickman ("Defendant") and his girlfriend, Ebonie Hampton

[1] The motion has been referred to the undersigned for a report and recommendation (Dkt. 21). See 28 U.S.C. § 636(b); Local Rules 6.01(b) and (c), M.D. Fla.

("Hampton"), were involved in a tax fraud scheme and had filed fraudulent U.S. Income Tax Returns. The search warrant permitted the seizure of evidence indicative of tax fraud, including debit cards and cash. (Govt's Ex. 1)

2. Prior to the execution of the search warrant, a briefing among the agents executing the warrant revealed that Defendant was a convicted felon and had a suspended driver's license.

3. At approximately 8:00 a.m., IRS Agent Casimir Tyska ("Agent Tyska"), and about six other agents, gained entry to the residence when Hampton, holding her infant child, answered the door. Two vehicles were parked in the driveway of the residence; one of the vehicles was registered to Defendant.

4. After entering the residence, Agent Tyska asked Hampton if there was anyone else in the residence and if there were any firearms in the residence. Hampton answered in the negative. She reported that Defendant was driving a child to school and would be returning to the residence shortly. After searching the sofa, Agent Tyska permitted Hampton to sit on the sofa with her child without being handcuffed.

5. Approximately ten minutes after gaining entry to the residence, law enforcement saw Defendant driving toward the residence and performed a traffic stop. By that time, the agents had "cleared" the residence, but not the detached garage, which was thirty to forty feet from the residence.[2] The search of residence had not yet commenced**.**

6. During the traffic stop, Defendant was directed to exit the vehicle. Agent Tyska briefly checked the vehicle and then asked Defendant if there were any firearms or weapons in the

---

[2] During "clearing" agents inspect areas where an individual might hide to impede the search.

residence. Defendant admitted to Agent Tyska that there was a firearm in his closet. Agent Tyska informed Defendant that he could be charged federally for being a felon in possession of a firearm.

7. After Agent Tyska advised Defendant of his Miranda rights, Defendant invoked his Fifth Amendment right to remain silent.

8. Defendant was then handcuffed and escorted to the backseat of the patrol car of Deputy Stephen Pierson ("Deputy Pierson") of the Hillsborough County Sheriff's Office ("HCSO"), who was at the scene.

9. After placing Defendant under arrest, Agent Tyska returned to the residence and informed the other members of the search team that there was a firearm in the residence. Specifically, Agent Tyksa told Postal Inspector Chad Bradley ("Inspector Bradley"), who was searching the master bedroom, that there was a firearm in the closet.

10. At approximately 9:10 a.m., Inspector Bradley, who had attended the briefing and knew that Defendant was a convicted felon, found a firearm wrapped in a towel in the back left corner of a shelf in an armoire in the master bedroom.[3] Inspector Bradley also found in the armoire a locked box containing cash. (Govt's Ex. 10) The clothing and possessions in the bedroom indicated it was used by a male and a female.

11. While Defendant waited in the patrol car, Deputy Pierson sat in the front seat of the patrol car and accessed his computer. Deputy Pierson knew that Defendant invoked his Miranda rights, but he did not attend the briefing and did not know that Defendant was a convicted

[3] Inspector Bradley testified that a number of items could have been wrapped in this towel, including keys, credit cards, and cash.

felon.

12. At some point, Defendant asked Deputy Pierson who was going to be charged. Deputy Pierson responded that he was unsure, it depended on what was found in the residence, and it was not his investigation. Without any prompting by Deputy Pierson, Defendant then disclosed that he owned the firearm in the residence and he did not want his girlfriend to get in trouble or go to jail. No interrogation occurred during this time.

13. Sometime thereafter, Detective Emanuel Feller ("Detective Feller") of the HCSO approached Deputy Pierson while Deputy Pierson and Defendant were in the patrol car. Detective Feller asked Deputy Pierson for a scale to weigh marijuana found in the residence. Deputy Pierson exited the vehicle to retrieve a scale for Detective Feller. When he returned, Defendant, who was still in the patrol car, stated that the marijuana was his, anything else illegal in the house was his as well, and he did not want his girlfriend to get in trouble. No interrogation occurred during this time.

14. At some point between 9:00 a.m. and 9:30 a.m., IRS-CI Special-Agent-in-Charge James Robnett ("SAC Robnett") exited the residence and approached Defendant while Defendant was in the patrol car. SAC Robnett knew that Defendant was a convicted felon and had invoked his Miranda rights. SAC Robnett informed Defendant that the IRS was investigating allegations of tax fraud against him and that he knew that Defendant admitted to a firearm in the residence. SAC Robnett told Defendant that he could discuss the tax fraud allegations if Defendant signed a form waiving his Miranda rights. He discussed the evidence of tax fraud found in the residence and Defendant's culpability. SAC Robnett spoke to Defendant for about five to six minutes. Defendant made no statements during this

encounter.

15. At approximately 10:30 a.m., Defendant asked for SAC Robnett to return to Deputy Pierson's patrol car. SAC Robnett opened the door of the patrol car, but did not ask Defendant any questions. He reiterated that he could not take any statements unless Defendant waived his rights in writing. Defendant stated that the firearm was his. Their exchange took less than a minute. No interrogation occurred during this time.

16. Between 10:30 a.m. and 11:00 a.m., IRS-CI Special Agent Christian Daley ("Agent Daley") arrived at the residence and transferred Defendant from Deputy Pierson's patrol car to the backseat of Agent Daley's vehicle.

17. While awaiting issuance of a written complaint and arrest warrant and directions to produce Defendant for his initial appearance, Agent Daley transported Defendant from the residence to the Falkenburg Road Jail. After arriving at the jail, Defendant was escorted to a holding cell in the jail where he waited from 11:15 a.m. to 1:00 p.m.

18. At approximately 1:00 p.m., Agent Daley and IRS-CI Special Agent Christopher Pekerol ("Agent Pekerol") transported Defendant from the Falkenburg Road Jail to the custody of the U.S. Marshal at the federal courthouse. Approximately five minutes from the courthouse, Defendant stated that he knew it was stupid to have the gun, but that things were crazy where they lived. No interrogation occurred during this time.

19. As a result of the search, law enforcement seized an envelope addressed to Defendant at the residence from Florida Medicaid. (Govt's Ex. 11)

**Conclusions of Law**

Defendant alleges that his incriminating statements about the firearm and the firearm

obtained as a result of those statements are inadmissible because he was interrogated by law enforcement prior to being advised of his Miranda rights, the seizure of the firearm was outside the scope of the search warrant, and the subsequent statements and seizure of the firearm were the product of the initial unlawful interrogation by Agent Tyska. The Government responds that Defendant's initial statement about the location of the firearm is admissible under the public safety exception to Miranda, the firearm was lawfully seized during the search, and Defendant's spontaneous statements after invoking his Miranda rights are admissible because they were not made in response to interrogation by law enforcement.

**1. Defendant's pre-Miranda Statement is Admissible**

Before questioning a person who has been taken into police custody, law enforcement must inform the person of: (1) the right to remain silent; (2) the possibility that the person's statements could later be used as evidence; and (3) the right to the presence of retained or appointed counsel. Miranda v. Arizona, 384 U.S. 436, 444 (1966).[4]

The public safety exception permits pre-Miranda questioning justified by an objectively reasonable need to protect law enforcement officers or the public. See New York v. Quarles, 467 U.S. 649, 657–59 (1984) (noting the need to distinguish between questions necessary to secure the safety of officers or the public and questions designed solely to elicit testimonial evidence from a suspect); see also United States v. Spoerke, 568 F.3d 1236, 1249 (11th Cir. 2009) (finding that the threat posed by two bombs in a vehicle on a city street permitted officers to question suspect).

Here, Agent Tyska asked a single question limited to whether there were any firearms or weapons in the residence. See United States v. Castellana, 500 F.2d 325, 326 (11th Cir. 1974)

---

[4] The Government conceded at the hearing that Defendant was in custody at the time Agent Tyska asked him if he had any firearms in the residence.

(finding statements admissible in response to an single limited inquiry about whether the defendant had any weapons within reach). An objectively reasonable concern regarding officer safety existed. There was an unhandcuffed suspect in the residence, and the officers did know if any individuals were in the detached garage, which had not yet been "cleared." It was reasonable to identify any potential threats in the residence before the search commenced. See United States v. Young, 58 F. App'x 980, 982 (4th Cir. 2003) (per curiam) (finding concern for officer safety when the premises had not been secured); United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1999) (finding the question "is there anything we need to be aware of" reasonable prior to search); Cf. United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994) (finding no safety threat after premises were secured and the defendant was the only suspect present).

The question to Defendant about any firearms or weapons was permissible under the public safety exception even though the agent knew that Defendant was a convicted felon. Defendant suggests that the public safety rationale is a subterfuge because Defendant was never charged with tax fraud, but was charged with being a felon in possession of a firearm. Although this case may test the outer boundaries of the public safety exception, accepting Defendant's position would ignore the objectively reasonable facts known to Agent Tyska and run afoul of the rule announced in Quarles that the public safety exception does not depend on the subjective intentions of the officers questioning the defendant. See Quarles, 467 U.S. at 655-56. Defendant's pre-Miranda statement regarding the firearm is admissible.

**2. The Firearm was Lawfully Seized**

Under the public safety exception, both "a defendant's statement—and the physical evidence recovered as a result of that statement—may be admitted into evidence at trial." United States v.

Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007) (citation and internal quotation marks omitted). Thus, the firearm seized from the search is admissible.

Additionally, the plain view doctrine permits a warrantless seizure where: (1) an officer is lawfully located in the place from which the seized object could be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the item is immediately apparent. Horton v. California, 496 U.S. 128, 135 (1990). "[A] search may be as extensive as reasonably required to locate the items described in the warrant." United States v. Wuagneux, 683 F.2d 1343, 1352 (11th Cir. 1982); see also United States v. Smith, 459 F.3d 1276, 1291 (11th Cir. 2006).

Irrespective of whether Defendant was properly questioned about a firearm pre-Miranda, the plain view exception also justifies the warrantless seizure of the firearm. Law enforcement had a valid search warrant to search Defendant's entire residence for evidence of tax fraud, including debit cards and cash. Inspector Bradley found the firearm wrapped in a towel in the back left corner of a shelf in an armoire in the master bedroom. A number of items could have been wrapped in this towel, including keys, credit cards, and cash. The incriminating nature of the firearm once the towel was removed was immediately apparent to Inspector Bradley, who knew from the briefing that Defendant was a convicted felon. Additionally, multiple factors indicated that Defendant lived at the residence, including male clothing and shoes in the master bedroom, law enforcement found an envelope addressed to Defendant in the residence, and a vehicle registered in Defendant's name was parked in front of the residence. Accordingly, the firearm was also lawfully seized under the plain view doctrine.

**3. Defendant's Post-Miranda Statements are Admissible**

Defendant's invocation of Miranda rights was neither ambiguous nor equivocal. A suspect's right to remain silent must be scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 103 (1975). Police must cease questioning when the person in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." Miranda, 384 U.S. at 473-74.

"[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of an interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. The focus of the inquiry is the perception of the suspect, rather than the intent of the police. Arizona v. Mauro, 481 U.S. 520, 527 (1987). However, any statement given "freely and voluntarily" is admissible. Miranda, 384 U.S. at 478.

While Defendant was in custody and after invoking his Miranda rights, Defendant made spontaneous incriminating statements regarding the firearm in the residence, but he was not subject to express questioning or its functional equivalent. Defendant made statements to Deputy Pierson, but Deputy Pierson did not interrogate Defendant, explicitly or implicitly, while sitting with him in the patrol car. Similarly, no interrogation occurred by Agents Daley and Agent Pekerol when they heard Defendant's incriminating statement while transporting Defendant to the federal courthouse.

SAC Robnett's encounter presents a closer question. He informed Defendant that the IRS was investigating allegations of tax fraud against him and stated that he knew that Defendant admitted to a firearm in the residence. He purposely approached Defendant to give him this information. SAC Robnett also told Defendant there was strong evidence of tax fraud. Approximately an hour later, Defendant summoned SAC Robnett. SAC Robnett had not asked

Defendant any questions when Defendant made incriminating statements. However, he had told him, both when he initially spoke with Defendant and after he returned to the patrol car at Defendant's request, that he would not question him unless Defendant waived his rights in writing.

While SAC Robnett's statement that he would not question Defendant unless Defendant waived his rights in writing might have conveyed that none of Defendant's statements could be used against him absent such an occurrence, there was no testimony to that effect at the hearing. The totality of circumstances indicates that Defendant's statement was spontaneous and not elicited by the functional equivalent of interrogation. See United States v. McKenzie, 132 F. App'x 788, 789 (11th Cir. 2005) (finding that an officer's informing the defendant that contraband was found in his house was not the functional equivalent of interrogation);[5] see also United States v. Allen, 247 F.3d 741, 764–65 (8th Cir. 2001) (holding that no interrogation occurred where police told suspect, who had requested but not yet received counsel, of the unfavorable results of the lineup in which he agreed to take part without counsel being present; police remark was a simple description of the status of the investigation, not interrogation).[6] Accordingly, Defendant's post-Miranda statements to SAC Robnett concerning the firearm are also admissible.

## Conclusion

Accordingly, and upon consideration, it is **RECOMMENDED** that:

(1) Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing (Dkt.

---

[5] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36–2.

[6] "This was a statement of fact and not a plea to conscience. . . . Rather, the officer simply described the results of the lineup, unaccompanied by any threats or other compelling pressure." Allen, 247 F.3d at 765 (citations omitted). "[M]ere declaratory descriptions of incriminating evidence do not invariably constitute interrogation." Id.

20) be **DENIED.**

**Date: January 24, 2013**.

ELIZABETH A JENKINS
United States Magistrate Judge

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

**Any party objecting to the report and recommendation shall file a copy of the transcript of the hearing on the motion to suppress.**